**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**C.A. # 5:16-cv-9**

| | |
|---|---|
| Deloris Gaston and Leonard Gaston, on behalf of themselves and all other similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LexisNexis Risk Solutions, Inc., a Georgia Corporation; and PoliceReports.US, LLC, a North Carolina Limited Liability Company,<br><br>Defendants. | **CLASS ACTION**<br>**AMENDED COMPLAINT**<br>**(JURY TRIAL DEMANDED)** |

## I. NATURE OF THE ACTION

1. The Plaintiffs and Putative Class Representatives, Deloris Gaston and Leonard Gaston ("Putative Class Representatives"), above named, complaining of the Defendants, LexisNexis Risk Solutions, Inc., (hereinafter referred to as "LexisNexis"), and PoliceReports.US, LLC (hereinafter referred to as "PoliceReports"), bring this consumer Class Action lawsuit pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), on behalf of themselves and a proposed class of similarly situated Individuals, (hereinafter referred to as "Class Members"), who were victims of unfair, deceptive, and unlawful business practices; wherein their privacy and security rights, were violated by Defendants. The Defendants, acting independently and in concert, each knowingly authorized, directed, ratified, approved, acquiesced, or participated, in conduct made the basis of this class action, which includes one or more of the following:

a. Directly obtaining Putative Class Representatives' and Class Members' Personal Information from Motor Vehicle Records ("MVRs") maintained by the State Motor Vehicle Department (hereinafter globally referred to as "Personal Information")1, for purposes that violate the Driver's Privacy Protection Act, 18 U.S.C. §2721 ("DPPA");

b. Using, processing, and re-disclosing, Putative Class Representatives' and Class Members' Personal Information for purposes that violate the DPPA;

c. Reselling Putative Class Representatives' and Class Members' Personal Information for purposes that violate DPPA;

d. Releasing, obtaining, purchasing, Putative Class Representatives' and Class Members' Personal Information to market and solicit Putative Class Representatives and Class Members, without their express consent, for purposes that violate the DPPA.

2. The nature of this action includes events wherein Defendant LexisNexis and Defendant PoliceReports contracted with various governmental agencies to provide copies of motor vehicle accident reports (hereinafter "Crash Reports") online. On information and belief, online requests to these governmental agencies for Crash Reports are automatically directed to the Defendant PoliceReports' website. On information and belief, Defendants LexisNexis and PoliceReports share receipts from online purchases of Crash Reports pursuant to their contractual relationships.

3. Defendants acted independently, and in concert, and each knowingly authorized,

1 The terms Personal Information, Motor Vehicle Record, and State Motor Vehicle Department are intended to be defined as set forth in 18 U.S.C. § 2725.

directed, ratified, approved, acquiesced, or participated, in conduct made the basis of this class action. Defendants obtained Putative Class Representatives' and Class Members' MVRs to use, process, store, re-disclose, and resell Putative Class Representatives' and Class Members' Personal Information, in an enterprise affecting interstate commerce, including as a Direct Market Provider of MVRs, to market and solicit, directly or indirectly, Putative Class Representatives' and Class Members' Personal Identifying Information, without their express consent. Defendants accomplished such activity covertly, without actual notice or express consent, and which information Defendants obtained deceptively, for purposes which included Defendants' commercial gain.

## II. PARTIES

4. Plaintiff and Putative Class Member Deloris Gaston is an individual residing in Charlotte, North Carolina, and is a licensed and registered motor vehicle driver in the State of North Carolina.

5. Plaintiff and Putative Class Member Leonard Gaston is an individual residing in Charlotte North Carolina, and is the owner of a registered motor vehicle and licensed driver in the State of North Carolina.

6. Defendant LexisNexis, a Georgia Corporation, is a leading global provider of content-enabled workflow solutions designed specifically for professionals in the legal, risk management, corporate, government, law enforcement, accounting, and academic markets. LexisNexis originally pioneered online information with its Lexis® and Nexis® services. LexisNexis is part of RELX Group and serves customers in more than 100 countries with more than 15,000 employees worldwide.

7. Defendant PoliceReports.US, LLC, is a North Carolina Corporation with a principal office located at 219 Williamson Road, Suite 2201, Mooresville, NC, 28117. Defendant PoliceReports was acquired by LexisNexis on August 4, 2014, and has operated as "A LexisNexis® Company" since that date. Defendant PoliceReports is an online distributor of vehicle accident/crash reports currently doing business in 30 states in the United States, including the State of North Carolina. PoliceReports.US bills itself as "The Industry Leader in Police Report Distribution."

## III. JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331.

9. This Court has jurisdiction over LexisNexis, a Georgia Corporation doing business in North Carolina.

10. This Court has jurisdiction over Defendant Police Reports.US, LLC, a North Carolina corporation which is headquartered in Mooresville, North Carolina, and doing business in North Carolina.

11. Putative Class Representatives are citizens and residents of North Carolina and assert claims on behalf of a proposed class whose members are domiciled throughout the fifty states and the U.S. territories.

12. This court has federal question jurisdiction as the complaint alleges violations of the Driver's Privacy Protection Act, 18 U.S.C. §2721.

13. Venue is proper in this District under 28 U.S.C. §1391(b) and (c) against Defendants. A substantial portion of the events and conduct giving rise to the violations of law

complained of herein occurred within this state, and within this district.

14. Subject-matter jurisdiction exists in this Court related to this action pursuant to 28 U.S.C. § 1332. The aggregate claims of Putative Class Representatives and the proposed Class Members exceed the sum or value of $5,000,000.00.

15. Venue is proper in this district and vests jurisdiction in the State of North Carolina and Federal Courts in this district, the location of their principal activity made the basis of this action. Thus, mandatory jurisdiction in this U.S. District Court vests for any Class Member, wherever they reside, which occurred within the United States. The application of the law should be applied to any Class Member, made the basis of this action, anywhere within the United States, as if any and all activity occurred entirely in North Carolina and to a North Carolina resident. Thus, citizens and residents of all states are Class Members, for all purposes related to this instant Complaint, similarly situated with respect to their rights and claims as North Carolina residents, and therefore are appropriately included as Class Members, regardless of their residency, or wherever the activity occurred made the basis of this action.

16. Minimal diversity of citizenship exists in this action, providing jurisdiction as proper in the Court, since Defendants conducted activity within this state and in this district during the class period, and Putative Class Representatives include citizens and residents of this state and district, and assert claims on behalf of a proposed class whose members are scattered throughout the fifty states and the U.S. territories; thus there is minimal diversity of citizenship between proposed Class Members and the Defendants.

17. This is the judicial district wherein the basis of the conduct complained of herein involving the Defendants was implemented, in whole or part.

## IV. PUTATIVE CLASS REPRESENTATIVES' AND CLASS MEMBERS' EXPERIENCES

18. Putative Class Representatives were involved in motor vehicle accidents in Mecklenburg County, North Carolina, or were owners of vehicles involved in accidents in Mecklenburg County on January 24, 2012, March 15, 2012, and February 4, 2015, all during the Class Period. On information and belief, in each accident, the investigating officers utilized information from the Putative Class Representatives' driver's license and/or motor vehicle registration (both "motor vehicle records" as defined in 18 U.S.C. § 2725(1)) to electronically access their "personal information" (as defined in 18 U.S.C. § 2725(3)), including driver identification numbers, names, and addresses, as maintained by the North Carolina Department of Motor Vehicles ("NCDMV") in connection with said driver's license and registration. On information and belief, the investigating officer electronically integrated the personal information obtained from the DMV with additional information pertaining to the motor vehicle crash using electronic crash reporting software.

19. On information and belief, the investigating officers and/or law enforcement agencies thereafter electronically transmitted Putative Class Representatives' personal information, along with the motor vehicle crash information, to the DMV for the purpose of creating a DMV-349 (Crash Report) on each accident. Copies of all three Crash Reports are attached hereto as Exhibit 1. On information and belief, the DMV checked and confirmed that the personal information submitted conformed to the DMV's records and then released and transmitted the Crash Reports to the originating law enforcement agency.

20. Each Crash Report contains the following heading: "THIS REPORT IS FOR THE

USE OF THE DIVISION OF MOTOR VEHICLES. THE DATA IS COLLECTED FOR STATISTICAL ANALYSIS AND SUBSEQUENT HIGHWAY SAFETY PROGRAMMING. DETERMINATIONS OF "FAULT" ARE THE RESPONSIBILITY OF INSURERS OR OF THE STATE'S COURTS." Each Crash Report includes personal information obtained from a motor vehicle record, and each Crash Report is a motor vehicle record, within the meaning of the DPPA.

21. On information and belief, Defendant PoliceReports has contracts with law enforcement agencies, including the applicable agencies in Mecklenburg County, North Carolina, to obtain copies of Crash Reports after they are approved and verified by DMVs and to make the Crash Reports, including the personal information contained therein, available to third persons. Putative Class Representatives are informed and believe that PoliceReports obtained their Crash Reports, including their personal information, after all three accidents, and disclosed that personal information to willing purchasers without verifying that the purchaser had a permitted purpose for obtaining the personal information. Putative Class Representatives are informed and belief that PoliceReports sells Crash Reports in bulk to law firms and other purchasers.

22. Shortly after all three accidents, Putative Class Representatives began receiving solicitation letters from law firms and other entities offering their services in regard to their recent automobile accidents. Some included copies of Putative Class Representative's DMV-349 Crash Reports. Putative Class Representatives did not retain any of the solicitation materials from the 2012 accidents, but they did retain all they received from the February 4, 2015, accident which are referenced below:

a. Aspire Advisory Group, LLC; dated May 1, 2015, re: Loss of Value Insurance claim: "It has recently come to our attention that you were in an automobile accident that was not your fault…We are in the unique business of recovering a vehicle's Loss in Value due to a collision…I have enclosed a copy of a claim

settlement check from one of our many clients for your validation." [Printed on the envelope : "POLICE REPORT ENCLOSED, TRAFFIC ACCIDENT RECORDS"]

b. Bradley Law Group; dated February 6, 2015: "It is my understanding that you may have been injured in an auto accident."

c. Campbell & Associates, Attorneys at Law; postmarked February 6, 2015: Firm Brochure enclosed.

d. Crumley Roberts, Attorneys at Law; postmarked February 9, 2015: "I bet you never knew an auto accident would make you so popular with area body shops, chiropractors and law firms." [Firm Brochure enclosed.]

e. Law Offices of Michael A. DeMayo, LLP; dated February 6, 2015; "I understand that you were recently involved in a serious collision…We have sent you a copy of your accident report…" [Accident Report and Accident Report Guide enclosed]

f. William J. Devin, III, Law Firm: postmarked February 6, 2015: "I am sorry to hear that you were involved in an automobile accident." [Firm Brochure enclosed.]

g. Ted A. Greve, D.C., J.D.: postmarked February 6, 2015: "Attorney Ted Greve is also a licensed Chiropractic Physician who has treated thousands of injured patients." [Firm Brochure enclosed.]

h. Thomas H. Grist, Attorney: postmarked February 6, 2015: "RE: Accident on February 3-6, 2015…I have a copy of your accident report …" [Accident Report enclosed stapled to letter]

i. Hunt Law Firm: dated February 6, 2015: " …This is probably not the first and only letter that you will receive concerning this matter. "***Police reports*** allow such information to be readily accessible to law firms and the general public. Our staff monitors such reports on a regular basis." [Firm Brochure enclosed.]

j. Lisa Lanier, Attorney at Law: dated February 6, 2015: "It has come to my attention through public records that you were recently involved in a motor vehicle accident. I am enclosing a copy of the police report for your convenience." [Accident Report and Firm Brochure enclosed]

k. Marcari, Russotto, Spenser, Balaban, P.C.: dated February 6, 2015: "What Now? Brochure: 'The officer completed an accident report, which was filed with the Department of Motor Vehicles. We include this in most packages." [Accident Report and "Understanding Your Police Reports" enclosed]

23. Putative Class Representatives' Personal Information was obtained, knowingly disclosed and made available to third persons by Defendants for purposes that involve marketing and solicitation of Putative Class Representatives' and Class Members' motor vehicle records, directly or indirectly, without notice or express consent;

24. Putative Class Representatives were unaware that Defendants had procured and disclosed their Personal Information for impermissible DPPA purposes;

25. Putative Class Representatives were unaware that Defendants used, re-disclosed, and resold their personal information from motor vehicle records for impermissible DPPA purposes;

26. Putative Class Representatives did not provide express consent to the use of their Personal Information by Defendants for purposes that included direct marketing and solicitation;

27. Putative Class Representatives could not have learned about Defendants' access to their Personal Information except through unreasonably burdensome efforts, such as those required in the investigation underlying these allegations;

28. Putative Class Representatives became the victims of privacy and security violations due to Defendants' unauthorized access to, and use of, their Personal Information, actions based solely on Defendants' attempt to use such for commercial gains;

29. Putative Class Representatives' explicit interest is to maintain the privacy of their Personal Information; however, Defendants continue to possess, use, re-disclose, resell, and purchase such data;

30. Putative Class Representatives and Class Members have standing to bring this case under Article III of the United States Constitution. Putative Class Representatives and Class

Members have standing by virtue of alleging concrete, tangible, and non-speculative injuries in fact, arising from violations of Federal Statutes. The law at issue herein creates legal rights, the invasion of which creates standing. Putative Class Representatives and the Class Members are within the zone of persons sought to be protected by these laws, and if such parties cannot protect such interests and seek either remuneration or injunctive relief, they would have no mechanism available to hold Defendants accountable for such misconduct;

31. Putative Class Representatives and Class Members have each suffered harm and as a result of Defendants' actions. Such losses constitute classic Article III injuries in terms of an uncompensated loss for which this Court can provide redress.

32. Putative Class Representatives seek to have Defendants cease its unauthorized activities, seek remedies to obligate Defendants to discontinue such unauthorized activities in the future, provide notice of any and all uses of their Personal Information obtained thereof and recover damages.

33. Class Members are United States residents that experienced the same type of events as Putative Class Representatives. Specifically, class members were in motor vehicle crashes, their Personal Information was utilized to create Crash Reports and is contained within the Crash Reports, Defendants obtained copies of the Crash Reports from a governmental agency, and Defendants distributed the Crash Reports in violation of the DPPA.

## V. STATEMENT OF FACTS AND THE DPPA

34. The DPPA's primary purpose is to protect the privacy and safety of all consumers that have provided information to the DMV.

35. Defendants acted independently, and in concert, and each knowingly authorized,

directed, ratified, approved, acquiesced, or participated, in conduct made the basis of this Class Action, in acts which include, but are not limited to, conducting, aiding and abetting, assisting, facilitating, participating, in a pattern of conduct, an enterprise affecting interstate commerce, to obtain motor vehicle records from State Motor Vehicle Departments, directly or indirectly, in order to use, re-disclose, resell, and purchase, for purposes that involve marketing and solicitation of Putative Class Representatives' and Class Members' motor vehicle records, without their express consent, as evidenced by the Defendants' business practices and associations. Defendants entered into contracts to obtain access to personal information from thousands of motor vehicle records on a continuous basis in 30 states within the United States.

36. To protect the privacy and safety of licensed drivers, and to limit misuse of the information contained in these government record systems, Congress enacted the Driver's Privacy Protection Act of 1994, 18 U.S.C. §§ 2721-2725. The Act imposed strict rules for collecting the personal information in driver records, and provided for liability in cases where an entity improperly collects, discloses, uses, or sells such records. Congress paid particular attention to differences between motor vehicle records and other public records containing similar information, which it decided not to regulate. One concern that motivated enactment of the DPPA was that personal information in motor vehicle records, including names and addresses, is associated with license plate numbers, which drivers must display to the general public.

37. "Unlike with license plate numbers, people concerned about privacy can usually take reasonable steps to withhold their names and address[es] from strangers, and thus limit their access to personally identifiable information" in other records. 140 Cong. Rec. H2523 (daily ed. Apr. 20, 1994) (statement of Rep. Edwards); ibid. (statement of Rep. Moran).

38. Congressional testimony in 1993 highlighted potential threats to privacy and personal safety from disclosure of personal information held in state DMV records:

a. Balancing the interests of public disclosure with an individual's right to privacy is a delicate, but essential, task for government. The Driver Privacy Protection Act (H.R. 3365), safeguards the privacy of drivers and vehicle owners by prohibiting the release of personal information--including a person's name and address—to anyone without a specific business-related reason for obtaining the information.

b. H.R. 3365 acknowledges that there are many businesses that depend on access to motor vehicle records to serve their customers, including insurance companies, financial institutions, vehicle dealers, and others. By focusing this legislation on the personal information contained within a driver file, this bill does not limit those legitimate organizations in using the information. It does, however, restrict access to all those without a legitimate purpose.

39. The testimony before Congress also discussed concerns that the personal information contained in state DMV records had considerable commercial value. In particular, the personal information sold by state DMVS were being used extensively at that time to support the direct-marketing efforts of businesses. See 1994 WL 212836 (Feb. 3, 1994) (statement of Richard A. Barton, Direct Marketing Association) ("The names and addresses of vehicle owners, in combination with information about the vehicles they own, are absolutely essential to the marketing efforts of the nation's automotive industry."). Personal information in DMV records "is combined with information from other sources and used to create lists for selective marketing use by businesses, charities, and political candidates." 140 Cong. Rec. H2522 (daily ed. Apr. 20, 1994)

(statement of Rep. Moran) (“Marketers use DMV lists to do targeted mailings and other types of marketing.”).

40. Professor Mary Culnan testified that privacy concerns about the use of information “are especially likely to arise when the reuse is not compatible with the original purpose for collecting the information,” since in such circumstances “the prospect of misinterpretation or crass exploitation usually follows.” 1994 WL 212834 (Feb. 3, 1994) (citation omitted). Professor Culnan further explained: DMV information is not collected voluntarily. Few people can survive without a driver[']s license or an automobile, and a condition of having either is to register with the state. By providing this information to marketers without providing an opt-out to its citizens, the state is essentially requiring people to participate in direct marketing absent any compelling public safety argument. This is in direct contrast to most of the other mailing lists based on private sector data, such as a list of subscribers to a particular magazine. The people on these lists have indicated an interest in participating in direct marketing because they have "raised their hands" in the marketplace by voluntarily responding to a commercial offer of some type. No such claim may be made for all licensed drivers and registered automobile owner[s].

41. Due to the concerns regarding the improper uses of motor vehicle records by the marketing industry, the DPPA was amended in 1999 to change the law to eliminate the practice of selling personal information. Senator Shelby, the principal sponsor, warned against “unrelated secondary uses” of motor vehicle information without prior approval (i.e., for commercial sale in the open market). Senator Shelby underlined that the purpose of the DPPA was to ensure that individuals must “grant their consent” before the state or a third party can sell or release highly restricted personal information “when it is to be used for the purpose of direct marketing,

solicitations, *or individual look-up*."4 *Hrg. Before the Subcomm. on Transp. of the S. Comm. on Appropriations, 106th Cong.* (2000) (statement of Sen. Shelby, Sponsor), available at 2000 WL 374404.

42. The "opt out" provisions of the original version of the DPPA was changed to "opt in" provisions in §§ 2721(b)(11) and (12) by the October 1999 amendments to the DPPA. See Pub. L. No. 106-69, 113 Stat. 986 (Oct. 9, 1999). Personal information in motor vehicle records could now be disclosed in certain circumstances for bulk distribution for surveys, marketing, or solicitation, but only if individuals are provided an opportunity, in a clear and conspicuous manner, to block such use of information pertaining to them. 18 U.S.C. 2721(b)(12). Thus, disclosure of motor vehicle information about an individual for direct-marketing purposes is prohibited unless (a) the individual is provided the opportunity, under Section 2721(b)(11), to block general disclosure of their personal information, and declines that opportunity, or (b) the individual is given the opportunity to block use of their personal information for direct marketing specifically, and declines that opportunity.

43. The DPPA defines "personal information" as "information that identifies an individual, including an individual's photograph, social security number, driver identification number, name address, telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status." 18 U.S.C. § 2725(3). The DPPA's general prohibition on disclosure of personal information is subject to fourteen (14) exceptions—the permissible purposes—which allow for the limited disclosure of personal information.

44. The 14 permitted uses of DMV data are designed to "strik[e] a critical balance between an individual's fundamental right to privacy and safety and the legitimate governmental and business needs for th[e] information." 140 Cong. Rec. 7925 (1994) (remarks of Rep. Moran). The DPPA never explicitly lists any prohibited uses; rather, it generally prohibits all but the fourteen permissible uses enumerated in section 2721(b). The fourteen permissible uses under the DPPA are:

> (1) For use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions.
> (2) For use in connection with matters of motor vehicle or driver safety and theft; motor vehicle emissions; motor vehicle product alterations, recalls, or advisories; performance monitoring of motor vehicles, motor vehicle parts and dealers; motor vehicle market research activities, including survey research; and removal of non-owner records from the original Owner records of motor vehicle manufacturers.
> (3) For use in the normal course of business by a legitimate business or its agents, employees, or contractors, but only-
> (A) to verify the accuracy of personal information submitted by the individual to the business or its agents, employees, or contractors; and
> (B) if such information as so submitted is not correct or is no longer correct, to obtain the correct information, but only for the purposes of preventing fraud by, pursuing legal remedies against, or recovering on a debt or security interest against, the individual
> (4) For use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court.
> (5) For use in research activities, and for use in producing statistical reports, so long as the personal information is not published, re-disclosed, or used to contact individuals.
> (6) For use by any insurer or insurance support organization, or by a self-insured entity, or its agents, employees, or contractors, in connection with claims investigation activities, antifraud activities, rating or underwriting.
> (7) For use in providing notice to the owners of towed or impounded vehicles.
> purpose permitted under this subsection.
> (9) For use by an employer or its agent or insurer to obtain or verify information relating to a holder of a commercial driver's license that is required under chapter 313 of title 49.
> (10) For use in connection with the operation of private toll transportation facilities.
> (11) For any other use in response to requests for individual motor vehicle records if the

> State has obtained the express consent of the person to whom such personal information pertains.
> (12) For bulk distribution for surveys, marketing or solicitations if the State has obtained the express consent of the person to whom such personal information pertains.
> (13) For use by any requester, if the requester demonstrates it has obtained the written consent of the individual to whom the information pertains.
> (14) For any other use specifically authorized under the law of the State that holds the record, if such use is related to the operation of a motor vehicle or public safety. 18 U.S.C. §2721(b).

45. Sections 2721(a) and 2722(a) make nondisclosure of personal information the default rule. See 18 U.S.C. § 2721(a) ("In general" prohibiting disclosure of personal information "except as provided in subsection (b)"); 18 U.S.C. § 2722(a) ("It shall be unlawful for any person knowingly to obtain or disclose personal information . . . for any use not permitted under section 2721(b) of this title."). Section 2721(b) then lists fourteen discrete exceptions to non-disclosure.

46. According to section 2721(c), "[a]n authorized recipient of personal information (except a recipient under subsection (b)(11) or (12) may resell or re-disclose the information only for a use permitted under subsection (b) (but not for uses under subsection (b)(11) or (12)). An authorized recipient under (b)(11) may resell or re-disclose personal information for any purpose. An authorized recipient under section (b)(12) may resell or re-disclose personal information pursuant to subsection (b)(12)." 18 U.S.C. § 2721(c).

47. Any person who receives personal information from a DMV and resells or further discloses that information must, for five years, maintain records identifying each person or entity to whom a further resale or re-disclosure was made, and the permitted purpose for such resale or re-disclosure. See 18 U.S.C. 2721(c).

48. The DPPA creates a private right of action for "the individual" whose personal information was knowingly obtained, disclosed, or used "for a purpose not permitted" under

section 2721(b). 18 U.S.C. § 2724(a). "It shall be unlawful for any person knowingly to obtain or disclose personal information . . . for *any* use not permitted under section 2721(b) of this title." 18 U.S.C. § 2722(a).

49. The DPPA expressly provides for liquidated damages independent of showing actual damages, where all damages are subject to the Court's discretion. The remedy for a violation of the DPPA is unambiguous under the plain terms of the statute. In *Kehoe v. Federal Bank & Trust*, the Eleventh Circuit held, based on the unambiguous language of the DPPA, which actual damages are not necessary in order to recover under the liquidated damages provision of the DPPA. 421 F.3d 1209, 1212 (11th Cir. 2005) (citing *Doe v. Chao,* 540 U.S. 614 (2004)). The DPPA remedies are as follows:

> (b) Remedies.--The court may award--
> (1) Actual damages, but not less than liquidated damages in the amount of $2,500;
> (2) Punitive damages upon proof of willful or reckless disregard of the law;
> (3) Reasonable attorneys' fees and other litigation costs reasonably incurred; and
> (4) Such other preliminary and equitable relief as the court determines to be appropriate.

50. The Congressional record is clear: the core aims of the DPPA are to prevent the unauthorized obtainment of a citizen's personal information and the statute creates a tangible right to have one's information secure. The violation of that security is a harm that supports standing. "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Linda v. Texas*, 410 U.S. 614, 617 n.3 (1973); furthermore, "The actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing …." *Warth v. Seldin*, 422 U.S. 490, 500 (1975).

51. The legislative history of the DPPA makes clear that it incorporated "the intentions

of the 1974 Privacy Act …. [And also] include[d] the recommendations of the 1977 Privacy Protection Study Commission [("PPSC")] report." The goal was to prohibit disclosure of "records" collected and maintained by a Government agency, except under permissible circumstances. See 5 U.S.C. § 552a(b). The PPSC report recommended that third party record holders be held to the "same standard" as the Government in order to ensure compliance with the important statutory protections. Personal Privacy in an Information Society: The Report of the Privacy Protection Study Commission Ch. 13 (July 1977).

52. This literal reading of the DPPA was designed to promote public safety and to protect individual privacy, construed so as to maximize their deterrent effect – in particular, by shifting burdens to institutional actors who regularly engage in the targeted conduct or are otherwise in a position to minimize future violations.

53. Congress intended the states to be the "gatekeepers" of the motor vehicle records, limiting the number of people with access to the personal information because the greater the number of people with access, the greater the risk that personal information will be disseminated to those who do not have valid uses for the personal information.

54. Recognizing the threat caused by unfettered access to individuals' Private Information obtained from motor vehicle records, and seeking to balance that concern against the legitimate need of certain parties to have access to DMV records, Congress determined that those records should not be disclosed except to those with a legitimate need for them. It embodied that intent in a statutory scheme designed to carefully limit the uses for which such information may be disclosed. 18 U.S.C. § 2721(b). Congress made clear its intent that the burden of ensuring the permissibility of disclosures be borne by data brokers by imposing a record keeping obligation on

them to maintain a list of not only the people to whom they disclosed the data, but also for what purpose the disclosure was made. 18 U.S.C. § 2721(c). The liability provisions of the DPPA are to be interpreted as imposing an affirmative obligation on resellers to determine the true purpose of the "authorized recipients."

55. In each sentence of section 2721(c) Congress linked the term "authorized recipient" to the specific section of 2721(b) that had authorized the release of the information to the recipient. Congress intended that the authorized recipients to be individuals, entities, or their agents, qualified to receive the information by the terms of section 2721(b). Resellers cannot obtain all of the personal information in the database simply by calling themselves resellers. Entities requesting motor vehicle records have to justify their receipt of personal information under the 2721(b) exception is applicable. Defendant PoliceReports.US, LLC. was not an "authorized recipient."

56. The United States Supreme Court analyzed the D.P.P.A.'s use of "authorized recipient" (albeit in dicta) in Reno v. Condon, noting a person must have initially obtained the data for an permissible purpose before resale or dissemination of the data: After listing section 2721(b)'s fourteen permissible purposes, Chief Justice Rehnquist equated authorized recipients under section 2721(c) with "private persons who have obtained drivers' personal information for one of the aforementioned permissible purposes to further disclose that information for any one of those purposes." This is also the most logical conclusion based on the language of the DPPA, the purpose of the statute, the legislative history, and common sense. (quoting Reno v. Condon, 528 U.S. at 146 (citing 18 U.S.C. §2721(c)).

57. To ensure that the privacy of driver records is adequately protected under the DPPA, it was necessary to impose a high standard of duty for resellers when the records they sell are

subsequently used for impermissible purposes, due in part because an industry of "resellers" had arisen to facilitate acquisition by end-users the information collected by State Motor Vehicle Bureaus. As the reseller is in the best position to determine whether the subsequent use of the data would be permissible under the Act, it is the reseller that must bear the burden of ensuring that an impermissible use does not occur and must investigate to determine if entities requesting the motor vehicle records have a DPPA permissible purpose. The state agency ceases to be the custodian of the data once it is obtained by the reseller; the reseller must therefore assume the responsibility and the liability for the subsequent use of the data resulting from its intentional resale, especially as it relates to direct marketing. The civil remedies provision would be rendered "toothless" if resellers could insulate themselves from liability based solely on conclusory representations of end users, without being required to exercise due care themselves.

58. The DPPA regulates the activity of resellers when acting as a "middleman", and places civil damage liability on the person and/or company that knowingly obtains, re-discloses, resells, and purchases the motor vehicle records for improper purposes.

59. In light of the text, structure, and legislative history of the DPPA, resellers are subject to a duty of reasonable care before disclosing DPPA-protected personal information, 18 U.S.C. § 2721(b)-(c). Resellers must exercise reasonable care in responding to requests for personal information drawn from motor vehicle records. Resellers are liable if they do not secure proof that representations made by the recipient of personal information were valid. Defendants failed to exercise such reasonable care when reselling the motor vehicle records.

60. The structure of the DPPA supports the conclusion that resellers owe a duty of reasonable care when reselling motor vehicle records to third parties. The DPPA statute uses the

word "knowingly," revealing that a level of duty of care exists. The DPPA provides an award of "punitive damages upon proof of willful or reckless disregard of the law." 18 U.S.C. § 2724(b)(2); In contrast, the court may award "actual damages, but not less than liquidated damages in the amount of $2,500." 18 U.S.C. § 2724(b) (1). The actual damages provision is silent as to the degree of fault necessary to trigger liability for actual damages. If, however, as the statute suggests, punitive damages are available only for willful and reckless violations of the DPPA, then actual damages must require something less -- that is, conduct that is neither willful nor reckless.

61. The structure of the DPPA clearly indicates that the liability of a reseller of motor vehicle records is not predicated on their knowledge of the end user's actual purpose. Rather, it is the same as the end user's. That is because section 2722(a) makes no distinction between the mental state required by the person who obtains motor vehicle records and one who discloses it. Indeed, the statue on its face applies equally to those who "obtain" and those who "disclose" personal information. 18 U.S.C. § 2722(a).

62. Section 2721(c) does not suggests that a reseller may re-disclose protected information so long as its customer claims to have a permissible use. Rather, the DPPA authorizes the resale of information only if there is an actual, not just a stated, permitted use. 18 U.S.C. § 2721(c); Thus, as a purely textual matter, the DPPA indicates that a reseller who sells protected information to a client without an actual permissible purpose is liable regardless what "certifications" that client has made.

63. Resellers owe the same or similar legal duty that obligates the State Motor Vehicle Department's when releasing Personal Information, that is to investigate fully whether individuals or companies obtaining the motor vehicle records have a DPPA permissible purpose. As the motor

vehicle records are resold, in whole or part, the likelihood of misuse grows exponentially. The DPPA provides no distinction as to obligations of the end-user, resellers, nor the State Motor Vehicle Departments, as Custodian of the motor vehicle records.

64. Subsection (b)(12) implements an important objective of the DPPA—to restrict disclosure of personal information contained in motor vehicle records to businesses for the purpose of direct marketing and solicitation. Direct marketing and solicitation presented a particular concern not only because these activities are of the ordinary commercial sort but also because contacting an individual is an affront to privacy even beyond the fact that a large number of persons have access to the personal information. The DPPA was enacted in part to respond to the States' common practice of selling personal information to businesses that used it for marketing and solicitations. Congress chose to protect individual privacy by requiring a state DMV to obtain the license holder's express consent before permitting the disclosure, acquisition, and use of personal information for bulk solicitation.

65. Defendants PoliceReports and LexisNexis acted as resellers/sources with legal duties, other than the ministerial task of soliciting rote representations from prospective requestors. Resellers must confirm those obtaining motor vehicle records have a DPPA permissible use to obtain motor vehicle records. This obligation is not met merely by accepting the end user's "say-so" in the presence of red flags suggesting the requested information was being sought for an improper DPPA purpose. A cursory review of end user's websites would reveal their business objectives, and provide "red flags" requiring additional review prior to the release of the Putative Class Representatives' and Class Members' Personal Information.

66. To verify the eligibility to invoke the claimed DPPA permissible purpose, an entity

must provide information, including but not limited to, proof relating to its business which must correspond to its claimed DPPA uses, current status, activity of the employing entity, and purported business affiliation. It is negligent if the reseller fails to make proper inquiries of the end-user, especially if "red flags" exist, and provide "red flags" requiring additional review prior to the purchase of the Putative Class Representatives' and Class Members' MVRs.

67. Defendants websites allow the purchase of Crash Reports by report date, location, or driver name and payment by credit card, prepaid bulk accounts or monthly accounts. Purchasers are not required to establish any permissible use provided in the DPPA to obtain access to Putative Class Representatives' and Class Members' MVRs.

68. Defendants' activities occurred throughout the United States, obtaining the personal information in motor vehicle records of Putative Class Representatives and the Class Members for purposes not permitted - a course of action, and a body of information, that is protected from access and disclosure by federal law.

69. The collection, use, and disclosure of Putative Class Representatives' and Class Members' Personal Information by Defendants implicate Putative Class Representatives' and Class Members' privacy and physical safety. Such information is afforded special attention due to the consequences for both privacy and physical safety that may flow from its disclosure. The heightened privacy and physical safety concerns generated by obtaining, using, and disclosing such information, without authorization, is apparent in U.S. law, creating restrictive consent standards for its obtainment, use, and disclosure.

70. Defendants have, either directly, or by aiding, abetting, and/or conspiring to do so, willfully, knowingly, negligently, or recklessly, disclosed, exploited, misappropriated and/or

engaged in widespread commercial usage of Putative Class Representatives' and the Class Members' motor vehicle records, obtaining personal information for Defendants' own benefit, without legal authorization, and without Putative Class Representatives' and Class Members' knowledge, authorization, or consent. Such conduct constitutes a highly offensive and dangerous invasion of Putative Class Representatives' and the Class Members' privacy and safety.

71. Defendants knowingly obtained, disclosed, and/or used Putative Class Representatives and Class Members personal information, derived from motor vehicle records, for a purpose not permitted legally, a violation of a federal statutory right.

72. At all times material, Defendants, and agents of the Defendants, knew, or reasonably should have known, that their actions violated clearly established statutory rights of the Putative Class Representatives and the Class members.

73. Putative Class Representatives and Class Members were harmed when Defendants intentionally, or in the alternative, negligently, obtained, processed, disseminated, stored, and used motor vehicle records to market and solicit Putative Class Representatives' and Class Members', obtained without authorization, and invading their right of privacy.

74. Defendants failed to acquire, independently, and in concert, the express consent, of Putative Class Representatives and Class Members before obtaining, collecting, generating, deriving, disseminating, storing, or causing to be stored, re-disclosing or purchasing the MVR data of Putative Class Representatives and Class Members.

75. The Defendants failed to provide adequate policies, practices, and procedures relating to the re-disclosure and resale to third parties obtaining the Putative Class Representatives' and Class Members' motor vehicle records.

76. In the course of committing the acts described above, Defendants intentionally accessed, on a repetitive basis, and without authorization, government facilities, in order to obtain Putative Class Representatives' and Class Members' motor vehicle records, intentionally exceeding access authorization, obtaining, and using Putative Class Representatives' and Class Members' motor vehicle records for impermissible purposes.

77. During the Class Period, each Plaintiff named herein had personal motor vehicle records obtained, used, re-disclosed, stored, resold, and purchased for purposes that included marketing and solicitation, without their express consent. Such data was identifiable as to each of the Putative Class Representatives and Class Members and were transmitted to third parties for purposes wholly unrelated to its use and functionality when Putative Class Representatives and Class Members produced such to the state.

## VI. CLASS ALLEGATIONS

78. Putative Class Representatives bring this action on behalf of themselves and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Putative Class Representatives seek certification of the following class:

> NATIONWIDE CLASS: All persons in the United States who, on or after, four (4) years prior to the date of this filed complaint, through the final disposition of this or any related actions (the "Class Period"), had their personal information from motor vehicle records maintained by their State Motor Vehicle Departments used to create a motor vehicle accident report, or whose personal information is contained within a motor vehicle accident report created by a State Motor Vehicle Department, and whose personal information was directly and knowingly obtained, used, re-disclosed, and/or resold, for purposes not authorized by the DPPA, and without their express consent, by the named Defendants.

79. Excluded from the class are the Defendants, its employees, officers, directors, agent, legal representatives, heirs, assigns, successors, individual or corporate entities acting

within a partnership, joint venture, trust, association, union, subsidiaries, whether wholly or partially owned, divisions, whether incorporated or not, affiliates, branches, joint ventures, franchises, operations under assumed names, websites, and entities over which Defendants' exercises supervision or control, or group of individuals associated in fact, although not a legal entity, or other legal entity, in addition to Putative Class Representatives' legal counsel, employees, and their immediate family, the judicial officers and their immediate family, and associated court staff assigned to this case, and all persons within the third degree of consanguinity, to any such persons.

80. Putative Class Representatives reserve the right to revise these definitions of the classes based on facts they learn as litigation progresses.

81. The Class consists of thousands, if not hundreds of thousands, of individuals and other entities, making joinder impractical.

82. The members of the Class are identifiable from the information and records in the custody of the Defendants identified in the Class definition.

83. Defendants' conduct, as complained of herein, is generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole. The claims of Putative Class Representatives are typical of the claims of all other Class Members.

84. The claims of Putative Class Representatives are typical of the claims of all other Class Members.

85. Putative Class Representatives will fairly and adequately represent and protect the interests of the Class. Putative Class Representatives have suffered damages in their own capacity

from the practices complained of, in that their personal information or highly restricted personal information has been unlawfully obtained, disclosed, and sold for a profit, and is ready, willing, and able, to serve as Class representatives.

86. Putative Class Representatives' have retained counsel with substantial experience in prosecuting complex litigation and class actions involving unlawful commercial practices. Putative Class Representatives and their counsel are committed to vigorously prosecuting this action on behalf of the Class Members, and have the financial resources to do so. Neither Putative Class Representatives nor their counsel have any interest that might cause them not to vigorously pursue this action.

87. A class action will cause an orderly and expeditious administration of Class Members' claims and economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured. Individual Class Members are unlikely to be aware of their rights and are not likely to be in a position (either through experience or financially) to commence individual litigation against Defendants.

88. Absent a class action, most Class Members would find the cost of litigating their claims to be prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

89. The Defendants have acted and failed to act on grounds generally applicable to Putative Class Representatives and all of the other Class Members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members.

90. The factual and legal basis of Defendants' liability to Putative Class Representatives, and to the other Class Members is the same, and has resulted in injury to Putative Class Representatives and all of the other Class Members. Putative Class Representatives and the other Class Members have all suffered harm and damages as a result of Defendants' wrongful conduct.

91. Certification of a class under Fed. R. Civ. P. 23 is appropriate because Putative Class Representatives and the putative Class Members have questions of law and fact that are common to the Class that predominate over any questions affecting only individual members of the Class, and a class action is superior to all other available methods for fair and efficient adjudication of this controversy in fact, the wrongs suffered and remedies sought by Putative Class Representatives and the other members of the Class are premised upon an unlawful scheme participated in by Defendants.

92. There are questions of law and fact common to Putative Class Representatives and the Class Members, and those questions predominate over any questions that may affect individual Class Members. Common questions for the Class include, but are not limited to the following:

a. Whether Defendants' conduct described herein violates the Driver's Privacy Protection Act, 18 U.S.C. §2721;
b. Whether Defendants possessed a duty to use reasonable care to investigate and determine the validity of the claimed DPPA permissible uses prior to, during, and after, re-disclosing, and/or reselling Putative Class Representatives' and Class Members' Personal Information;
c. The nature and extent of Putative Class Representatives' and Class Members' actual damages;
d. The nature and extent of all statutory penalties or damages for which Defendants are individually liable to Putative Class Representatives and Class Members, and;
e. Whether punitive damages are appropriate.

## FIRST CAUSE OF ACTION
## Violations of the Driver's Privacy Protection Act, § 18 U.S.C. § 2721 et seq.
## Against All Defendants

93. Putative Class Representatives incorporate by reference and re-allege all paragraphs previously alleged herein.

94. As set forth herein, Defendants violated the Driver's Privacy Protection Act, 18 U.S.C. § 2721, by engaging in the acts alleged in this complaint.

95. The Driver's Privacy Protection Act, 18 U.S.C. §2721 (a) et seq., regulates obtaining and disclosing personal information gathered by State Departments of Motor Vehicles, making it unlawful for a person or organization to knowingly obtain or disclose personal information, or highly restricted personal information contained in motor vehicle records for any purpose not specifically enumerated under §2721(b).

96. Accordingly, Defendants violated 18 U.S.C. §2721 et seq. by intentionally obtaining, using, re-disclosing, and reselling Putative Class Representatives' and Class Members' Personal Information without knowledge, consent, or authorization, for purposes not specifically enumerated with the act.

97. Putative Class Representatives and Class Members are "person[s] referencing" "an individual, organization, or entity, but does not include a State or agency thereof", within the meaning of 18 U.S.C. §2725(2).

98. 18 U.S.C. § 2724(a) prohibits the release and disclosure of personal information, as defined in 18 U.S.C. § 2725(3) about an individual obtained by the State Motor Vehicle Department except as provided in subsection (b), permissible uses, regulates the prohibition on release and use of certain personal information from State motor vehicle records.

99. Under 18 U.S.C. §2725(3) "personal information" means information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information; but does not include information on vehicular accidents, driving violations, and driver's status.

100. The Cash Reports or motor vehicle accident reports obtained and distributed by Defendants pertaining to the Putative Class Representatives and Class Members constitute a "motor vehicle record", referencing "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles", within the meaning of 18 U.S.C. §2725(1).

101. The Crash Reports or motor vehicle accident reports obtained and distributed by Defendants contain personal information that has been obtained from motor vehicle records.

102. 18 U.S.C. § 2722(b), prohibits any organization or entity from making any false representation to obtain any personal information or highly restricted personal information from an individual's motor vehicle record.

103. Defendants violated 18 U.S.C. §2721 (b), individually, and in concert, by making false representations to knowingly obtain the Putative Class Representatives' and Class Members' motor vehicle records, directly or indirectly, for Direct Marketing purposes, or in the alternative, providing for use in marketing and solicitation of Putative Class Representatives and Class Members, without their express consent.

104. 18 U.S.C. §2725(5) "express consent" means consent in writing, including consent conveyed electronically that bears an electronic signature as defined in section 106(5) of Public

Law 106–229.

105. 18 U.S.C. § 2721(c), permits an "authorized recipient" of personal information (except for some exceptions) to resell or re-disclose the information, but only for a use permitted under 18 U.S.C. § 2721(b). Defendants were not authorized recipients, thereby violating 18 U.S.C. § 2721(c).

106. Defendants are liable directly and/or vicariously for failing to use reasonable care to investigate permissible uses when re-disclosing and reselling Putative Class Representatives' and Class Members' motor vehicle records.

107. DPPA, 18 U.S.C. § 2722(b)(12), prohibits the use of motor vehicle records for bulk distribution for surveys, marketing or solicitations unless the State has obtained the express consent of the person to whom such personal information pertains.

108. Defendant PoliceReports violated 18 U.S.C. § 2722(b)(12) by obtaining, using, re-disclosing, reselling, and purchasing the motor vehicle records for purposes that include marketing or solicitation, without express consent of Putative Class Representatives.

109. Putative Class Representatives and the putative Class Members have suffered damages, as alleged herein, and pursuant to 18 U.S.C. § 2724(b)(1), are entitled to actual damages, but not less than liquidated damages in the amount of $2,500 each.

110. Putative Class Representatives and the Class, pursuant to 18 U.S.C. § 2724(b)(1), are entitled to preliminary, equitable, and declaratory relief, in addition to statutory damages of the greater of money, actual and punitive damages, reasonable attorneys' fees, and Defendants' profits obtained from the above-described violations. Unless restrained and enjoined, Defendants will continue to commit such acts. Putative Class Representatives remedy at law is not adequate to

compensate him for these inflicted and threatened injuries, entitling Putative Class Representatives to remedies including injunctive relief as provided by 18 U.S.C. § 2724(b)(1).

111. As a direct and proximate result of the aforesaid acts and activities of Defendants, Putative Class Representatives, and each of them, have been caused to sustain harm.

112. All of the acts and activities of Defendants, as heretofore set out, were performed intentionally, fraudulently, maliciously, knowingly, conspiratorially, and or, negligently.

113. Putative Class Representatives and Class Members were damaged thereby, and seek redress thereof.

WHEREFORE, Putative Class Representatives, individually, and on behalf of all others similarly situated, respectfully prays for judgment against Defendants as follows:

1. For an order certifying that this action may be maintained as a class action under Fed. R. Civ. P. 23(a) and (b)(1)(a), (b)(2), and (b)(3);
2. For an order designating Putative Class Representatives and their counsel as representatives of the Class;
3. For a declaration that Defendants' actions violated the Federal Driver's Privacy Protection Act, 18 U.S.C. §2721, and for all actual damages, statutory damages, penalties, and remedies available as a result of Defendants' violations of the DPPA, but not less than liquidated damages in the amount of $2,500 for each Plaintiff and each member of the Class.
4. For an order awarding injunctive and equitable relief including, inter alia: (i) prohibiting Defendants from engaging in the acts alleged above; (ii) requiring

Defendants to disgorge all of its ill-gotten gains to Putative Class Representatives and the other Class Members motor vehicle records, or to whomever the Court deems appropriate; (iii) awarding Putative Class Representatives and Class Members full restitution of all benefits wrongfully acquired by Defendants by means of the wrongful conduct alleged herein; and, (iv) ordering an accounting and constructive trust imposed on the data, funds, or other assets obtained by unlawful means as alleged above, to avoid dissipation, fraudulent transfers, and/or concealment of such assets by Defendants;

5. For a preliminary and permanent injunction restraining Defendants, its officers, agents, servants, employees, and attorneys, and those in active concert or participation with any of them from: (i) Obtaining, directly or indirectly, Putative Class Representatives' and Class Members' Motor Vehicle Records, derived in whole or part, from data maintained by the State Motor Vehicle Department, for purposes that violate the Driver's Privacy Protection Act; (ii) Using, processing, and disseminating, Putative Class Representatives' and Class Members' motor vehicle records for purposes that violate the DPPA; (iii) Re-disclosing by reselling Putative Class Representatives' and Class Members' motor vehicle records for purposes that violate DPPA; (iv) Using, directly or indirectly, Putative Class Representatives' and Class Members' motor vehicle records to market and solicit Putative Class Representatives' and Class Members', without their express consent, for purposes that violate the DPPA;

6. For a permanent injunction enjoining and restraining Defendants, and all persons or entities acting in concert with them during the pendency of this action and thereafter

perpetually, from: (i) Obtaining, directly or indirectly, Putative Class Representatives' and Class Members' Personal Information, derived in whole or part, from data maintained by the State Motor Vehicle Department, for purposes that violate the Driver's Privacy Protection Act; (ii) Using, processing, and disseminating, Putative Class Representatives' and Class Members' personal information from motor vehicle records for purposes that violate the DPPA; (iii) Re-disclosing by reselling Putative Class Representatives' and Class Members' Personal Information for purposes that violate DPPA; (iv) Using, directly or indirectly, Putative Class Representatives' and Class Members' Personal Information to market and solicit Putative Class Representatives' and Class Members', without their express consent, for purposes that violate the DPPA.

7. For an award to Putative Class Representatives and the Class of their costs and expenses of this litigation;

8. For an award to Putative Class Representatives and the Class for their reasonable attorneys' fees;

9. An award to Class Members of damages, including but not limited to: compensatory, statutory, exemplary, aggravated, and punitive damages, as permitted by law and in such amounts to be proven at trial;

10. For pre-and post-judgment interest as allowed by law;

11. For this matter to be tried before a jury; and

12. For such other relief as the Court may deem just and proper.

Dated: May 12, 2016


*s/Larry S. McDevitt*
Larry S. McDevitt
NC State Bar # 5032
David M. Wilkerson
NC State Bar #35742
Heather Whitaker Goldstein
NC State Bar #26194
The Van Winkle Law Firm
PO Box 7376,
Asheville, NC 28802
Telephone: 828-258-2991
Email: lmcdevitt@vwlawfirm.com
Email: dwilkerson@vwlawfirm.com
Email: hgoldstein@vwlawfirm.com

Eugene C. Covington, Jr.
SC State Bar #1422
Eugene C. Covington, Jr., P.A.
PO Box 2343
Greenville, SC 29602
Telephone: 864-240-5502
Email: gcovington@covpatlaw.com
(to be admitted Pro Hac Vice)

Chris Cogdill
SC State Bar #15586
Christopher L. Cogdill, P.A.
1318 Haywood Road
Greenville, S.C. 29615
Email: chris@cogdill-law.com
(to be admitted Pro Hac Vice)

***Attorneys for Putative Class Representatives***

## CERTIFICATE OF SERVICE

I certify that on May 12, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.

This 12th day of May, 2016.

s/*Larry S. McDevitt*___
Larry S. McDevitt